UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| **JACK R. JORDAN,** | |
| **Plaintiff,** | |
| v. | **Case No.:** 12-cv-2573 EFM/DJW |
| **SPRINT NEXTEL CORPORATION**<br>Serve:<br>Corporation Service Company, Registered Agent<br>2900 SW Wanamaker Drive, Suite 204<br>Topeka, KS 66614<br><br>and<br><br>**GARY D. FORSEE**<br>3 Dunford Circle<br>Kansas City, MO 64112 | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## COMPLAINT

### General Nature of the Case.

1.  This is an action under Section 806 of the Sarbanes-Oxley Act of 2002 ("SOX") (18 U.S.C. § 1514A) for retaliation against Jordan because Jordan engaged in activities protected under that statute. Jordan provided information or caused information to be provided to Sprint officers and directors and staff of the United States Securities and Exchange Commission ("SEC") about violations of SEC rules and regulations and securities laws, including those prohibiting fraud, regarding several issues. They included disclosures that Sprint was required to include in its SEC filings pertaining to transactions Sprint entered into with its executive officers and violations of Sprint's ethics code by executive officers. Jordan also reported that disclosures that Sprint included in SEC filings were materially false or misleading and that purchases or sales of securities had occurred using manipulative or deceptive practices.

1

**Parties, Jurisdiction and Venue**

2.      Plaintiff Jack R. Jordan ("Jordan") was employed at the Overland Park, Kansas, headquarters of Sprint as an attorney in the Corporate Secretary's Group of Sprint's Law Department from January 13, 2003 through April 25, 2005.  Since April 25, 2005, Jordan has sought to be reinstated as a Sprint employee.  Jordan is an attorney who is and at all relevant times was admitted to the Bar Association of the State of New York.

3.      Defendant "Sprint" refers to Sprint Corporation before about August 12, 2005, and Sprint Nextel Corporation on and after August 12, 2005.  On or about August 12, 2005, Sprint Corporation merged with Nextel Communications, Inc. ("Nextel"), to form Sprint Nextel Corporation.  At all times relevant hereto Sprint has been a company incorporated in the State of Kansas and has had its principal place of business or principal operational place of business in Overland Park, Kansas.  At all times relevant hereto Sprint has had one or more classes of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78a *et seq.*) (the "Exchange Act") and it has been required to file reports under Section 15(d) of the Exchange Act.   At all times relevant hereto Sprint has had equity securities listed for trading on the New York Stock Exchange ("NYSE"), which is an open, efficient and well developed market.

4.      Defendant Gary D. Forsee ("Forsee") was the Chief Executive Officer ("CEO") of Sprint and a member of Sprint's Board of Directors from about March 19, 2003 until about August 12, 2005.  He was Chairman of Sprint's Board of Directors from about May 13, 2003 until about August 12, 2005.  He was Sprint Nextel's CEO and a member of Sprint Nextel's Board of Directors from about August 13, 2005 until about October 8, 2007.  He was Chairman of Sprint Nextel's Board of Directors from about December 12, 2006 until about October 8, 2007.  Plaintiff believes that Mr. Forsee currently resides in Missouri but his current address is unknown.

5. In 2005, 2006, and 2010 Jordan timely filed complaints with the Occupational Safety and Health Administration ("OSHA") and subsequently timely initiated proceedings before a DOL administrative law judge regarding Jordan's claims of retaliation. SOX Section 806 provided that during the pendency of the DOL proceedings regarding Jordan's claims, Jordan could remove each claim to federal district court if the Secretary of Labor had not issued a final decision with respect to such claim within 180 days after Jordan had filed the applicable complaint with OSHA and such delay was not the result of bad faith by Jordan. The regulations also required Jordan to give 15 days' advance notice of his intention to remove such claim to federal district court. Both those conditions precedent were satisfied with respect to each of Jordan's three OSHA complaints. The DOL's Administrative Review Board dismissed Jordan's last two complaints effective August 31, 2012 so that Jordan could pursue all his claims together in federal district court.

6. This Court has original subject matter jurisdiction under 18 U.S.C. § 1514A(b)(1)(B) without regard to the amount in controversy. Venue lies in this district pursuant to 28 U.S.C. §1391 as Sprint's headquarters are located at 6200 Sprint Parkway, Overland Park, Kansas, and many of the acts and transactions constituting the violations alleged herein occurred in this district.

**Facts**

7. Jordan's protected activities consisted primarily of complying with duties that were imposed on Jordan by the rules that the SEC had issued under SOX Section 307 (the "SOX 307 Rules") governing the professional responsibilities of attorneys who were deemed to be appearing and practicing before the SEC.

8. Jordan was subject to the SOX 307 Rules from the time they became effective on or about August 5, 2003 until at least April 25, 2005. The SOX 307 Rules required Jordan to report

3

evidence that Sprint officers and directors had committed material violations of SEC rules, securities laws or fiduciary duties.

9. The SOX 307 Rules permitted Jordan to fully satisfy his obligations thereunder by making his reports to Claudia S. Toussaint ("Toussaint"), who was Jordan's supervisor and the Sprint vice president in charge of the Corporate Secretary's group of Sprint's Law Department. Alternatively, Jordan could report to Sprint's General Counsel, Thomas A. Gerke ("Gerke"), in which case, Jordan would be required to further report to Sprint's CEO and some or all of Sprint's directors if Jordan did not receive an appropriate response from Sprint's General Counsel.

10. In 2003, and effective throughout the remainder of Jordan's employment at Sprint, Toussaint assigned Jordan primary responsibility for the following duties, among others: (i) preparing annual questionnaires for officers and directors, including regarding Related Party Transactions, (ii) analyzing the results of officers' and directors' responses to those questionnaires; and (iii) preparing Sprint's disclosures in SEC filings regarding Related Party Transactions and the strength of Sprint's corporate governance.

11. In about the first week of March 2004, Sprint officers including Forsee intended to take actions with respect to disclosures in Sprint's 2004 proxy statement regarding Forsee's compensation.

12. On about March 4, 2004 Jordan reported to Toussaint that those actions would constitute a violation of fiduciary duties to Sprint.

13. In January and February 2004 Jordan also reported information to Toussaint about other matters that Jordan subsequently learned were related to violations of SEC rules and regulations by Forsee and other Sprint officers.

14. In 2004 and 2005 under SEC rules and regulations and securities laws Sprint was required to file with the SEC and deliver to shareholders Sprint's 2004 and 2005 proxy statements and 2003 and 2004 annual reports, respectively.

15. Sprint also was required to described in each of its proxy statements and annual reports any transaction or series of transactions in the previous year amounting to more than $60,000 directly or indirectly between Sprint and any executive officer or board member or certain of their family members (each a "Related Party Transaction"). Sprint was required to disclose the dollar amount of each Related Party Transaction.

16. The SEC rules further required that in describing a transaction such as Sprint's purchase of a Sprint executive officer's residence, Sprint was required to disclose the principle followed in determining Sprint's purchase price and the name of the person making such determination.

17. In 2003 and 2004, Sprint engaged in a number of transactions with certain executive officers, including Forsee and Bruce N. Hawthorne ("Hawthorne"), Forsee's Chief Staff Officer.

18. Sprint purchased the former residences of Forsee, Hawthorne, and Howard Janzen ("Janzen") in 2003 for $2,920,000, $1,150,000 and $372,000, respectively, in connection with which Sprint suffered losses of $720,000, $250,000 and $22,500 upon resale, respectively.

19. In 2003 Janzen and Michael Stout ("Stout") also received loans directly or indirectly from Sprint of $250,000 and $100,000, respectively. The foregoing transactions will be collectively referred to herein as the "Relocation-Related Transactions." In addition, Forsee, Hawthorne, and Janzen received other relocation-related benefits worth significant financial value. Each of Forsee, Hawthorne, Janzen and Stout was an executive officer of Sprint in 2003 and 2004.

5

20. In 2003 and 2004, Sprint and Forsee were being heavily criticized in the media and among corporate governance advocates because Forsee's remuneration and the cost to Sprint of bringing Forsee to Sprint was perceived to be exorbitant or outrageous. Forsee desired to prevent the details of certain of the Relocation-Related Transactions from becoming known.

21. In addition, some of the details of the Relocation-Related Transactions indicated improprieties, including violations of Sprint's ethics code and the terms of executive officer employment agreements. For example, upon information and belief, in February 2004, Hawthorne's employment as Forsee's Chief Staff officer was terminated as a result of Hawthorne's Relocation-Related Transactions, and Forsee did not want to disclose information about those transactions.

22. In addition, in Sprint's SEC filings on and between March 16, 2004 and March 15, 2005, Forsee and other Sprint officers caused Sprint to represent that the value of Forsee's former residence had been determined by "independent" appraisals and that each of Forsee's, Hawthorne's, and Janzen's former residences had been purchased at its "independently appraised fair market value."

23. However, Sprint conceded in its SEC filings in April through June 2005 that the three executive officers' former residences had not been purchased at their "independently appraised fair market value[s]." Sprint also continued to fail to disclose the principle followed in determining Sprint's purchase prices and the name of the persons making such determinations.

24. In 2004, Jordan did not know any of the details of the Relocation-Related Transactions. Nevertheless, because of Jordan's general awareness of the benefits of Sprint's relocation program, Jordan believed that, in connection with the proxy statement that Sprint later filed on March 16, 2004, Sprint was preparing to violate SEC rules requiring disclosures of Related Party Transactions that were related to executive officers' relocations in 2003.

25. In approximately January 2004, Jordan reported his evidence of such pending violations to Toussaint. He also informed Toussaint that Sprint very likely had made loans to executive officers in connection with their relocations to Kansas City, and Sprint was required to disclose such loans if they exceeded $60,000.

26. In about late January and early February 2004, Jordan repeatedly informed Toussaint that SEC rules and regulations required executive officers' relocation-related Related Party Transactions to be disclosed in Sprint's 2004 proxy statement that the amounts of executives officers' relocation benefits that were intended to be reported in Sprint's 2004 proxy statement appeared to be too low. Jordan stated that it appeared that the procedures employed in determining the amounts to be disclosed in Sprint's proxy statement were deficient.

27. After Toussaint and Gerke learned of the 2003 Relocation-Related Transactions they did not disclose to Jordan any of the details of such transactions. In about late January 2004, Toussaint reassigned responsibility for addressing Sprint's March 2004 proxy statement disclosures of the 2003 Relocation-Related Transactions benefits from Jordan to another Sprint attorney. However, Toussaint did not inform Jordan of her decision to do so.

28. Toussaint excluded Jordan from all conversations with Sprint attorneys or outside counsel regarding any details of any Relocation-Related Transactions or Sprint's obligations to disclose them.

29. By February 6, 2004, Sprint employees including Toussaint, Gerke and Forsee knew that in 2003 (i) Sprint had indirectly purchased the former residences of Forsee, Hawthorne and Janzen for $2,920,000, $1,150,000, and $372,500, respectively; (ii) Sprint had indirectly sold the former residence of Hawthorne for $900,000, thereby incurring a loss of $250,000; and (iii) Sprint

indirectly had extended loans to Janzen and Stout of $250,000 and $100,000, respectively, and they knew all that information was required to be disclosed in Sprint's 2004 SEC filings.

30. The disclosures of Related Party Transactions as they existed in the February 6, 2004 draft of Sprint's 2004 proxy statement failed to include any information about the Relocation-Related Transactions.

31. Nevertheless, in a telephone conversation on or about February 7, 2004, among Toussaint, Jordan, and a third Sprint attorney, Toussaint pressured Jordan to agree that those disclosures were complete and accurate.

32. Jordan told Toussaint that he could not make this statement, and he could not countenance such a statement by Toussaint, until after Jordan had been given access to the information regarding the 2003 relocation benefits of senior executive officers.

33. Toussaint misled Jordan and discouraged him from further opposing her conduct by claiming that she had obtained a memorandum from outside counsel explaining why additional disclosure was not required regarding senior executives' 2003 relocation benefits.

34. Jordan asked to be provided a copy of this memorandum, but Toussaint did not provide it. In exasperation, Toussaint finally, and for the first time, informed Jordan that she had reassigned responsibility for SEC disclosures regarding the Relocation-Related Transactions to the other Sprint attorney who participated in that telephone conversation and Toussaint instructed Jordan to cease to working on those issues in 2004.

35. In March and April 2004 Forsee and others caused Sprint to violate federal securities laws by sending to Sprint shareholders proxy solicitation materials that materially violated SEC rules and regulations by failing to disclose (i) the price at which Sprint purchased Forsee's former residence and (ii) any information about Hawthorne's, Janzen's and Stout's Relocation-Related Transactions. In

those same proxy solicitation materials, Forsee and others made statements about Sprint's ethics and compliance programs and its corporate governance that were false and misleading in light of the foregoing violations of SEC rules and regulations and securities laws.

36. Upon information and belief, Sprint employees or agents took other actions to prevent shareholders from learning of the purchase price of Forsee's former residence, including by delaying recording that transaction in public records for nine months.

37. Forsee and other Sprint officers knew that Forsee's remuneration in 2003 and the strength of Sprint's ethics and compliance programs and its corporate governance were issues that were material to Sprint shareholders' voting in 2004 regarding at least the election of Sprint director Linda Lorimer and one or more shareholder proposals.

38. The portion of Sprint's 2004 proxy statement that should have contained disclosures of the 2003 Relocation-Related Transactions was incorporated by reference into Sprint's 2003 annual report.

39. On about March 9, 2004 and November 9, 2004, Forsee and other Sprint officers caused Sprint's 2003 annual report to be filed with the SEC while omitting material information about the 2003 Relocation-Related Transactions.

40. On about March 9, 2004 and November 9, 2004, in certifications that are required by federal securities laws and SEC rules and regulations, Forsee certified that (i) Sprint's 2003 annual report was prepared in full compliance with the SEC rules governing the preparation of annual reports and (ii) based on his knowledge, Sprint's 2003 annual report did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

41. Each such certification by Forsee in 2004 was false.

42. In 2004, Sprint sold Forsee's former residence for $2,200,000; thereby incurring a loss of $720,000. Forsee and others knew of this transaction in 2004 and they knew that it was required to be disclosed in Sprint's 2005 SEC filings, but none of them informed Jordan until after he reported his concerns to the entire Board of Directors of Sprint on about March 3, 2005.

43. In January 2005, Jordan became aware that SEC rules and regulations and securities laws required Sprint's 2005 joint proxy statement/prospectus to include disclosure of Related Party Transactions for all three years 2002 through 2004. In January and February 2005, Jordan repeatedly informed Toussaint of this disclosure requirement. By at least February 10, 2005, Gerke was aware of this disclosure requirement.

44. In January 2004 and 2005 a Director and Officer Questionnaire was forwarded to Forsee asking him to provide information to Jordan, including regarding all Related Party Transactions in 2003.

45. In his responses to those requests for information Forsee failed to disclose any information about his Relocation-Related Transactions.

46. In February 2005, Jordan asked Forsee to provide information to Jordan or ensure Jordan's access to information specifically about the Relocation-Related Transactions in connection with the preparation of Sprint's 2005 joint proxy statement/prospectus. Forsee withheld all such information from Jordan and Forsee caused other Sprint employees to withhold all such information from Jordan.

47. In February 2005, Jordan repeatedly asked Gerke to provide information to Jordan or ensure Jordan's access to information specifically about the Relocation-Related Transactions in connection with the preparation of Sprint's 2005 joint proxy statement/prospectus. Gerke did not provide any such information to Jordan.

48. As a result of Jordan's discussions with Forsee and Gerke in February 2005, Jordan realized—and he reported to Forsee and others consistent with the SOX 307 Rules—that Forsee, Gerke and others had engaged in 2004, and in 2005 they were attempting to engage, in material violations of SEC rules, federal securities laws, and their fiduciary duties to Sprint in additional material violations of SEC rules, federal securities laws, and their fiduciary duties to Sprint.

49. On or about March 3, 2005, consistent with the SOX 307 Rules, Jordan reported to Sprint's entire Board information about the violations he had previously reported to Forsee and other Sprint officers.

50. In March 15, 2005, Sprint finally disclosed in an SEC filing some of the information that Forsee and others had failed to disclose to shareholders in 2004 and were attempting to conceal from shareholders in 2005.

51. Even the information that Sprint officers did cause Sprint to disclose on March 15, 2005 was inaccurate and incomplete in material respects, and the lengths to which Sprint officers, including Forsee, went to prevent that information from being disclosed demonstrated that their violations were willful and knowing.

52. In 2004 and 2005 Forsee and Gerke were executive officers of Sprint. Consequently, if either of them violated Sprint's ethics code, Sprint was required to take action to hold them accountable. Otherwise, under SEC rules and rules of the NYSE, Sprint would be deemed to have granted an implicit waiver of Sprint's ethics code. If Sprint did grant any implicit waivers, it was required to include in its SEC filings a description of any waiver of its ethics code that it granted to any executive officer.

53. The failure to include in Sprint's SEC filings disclosures regarding waivers would and did constitute additional violations of SEC rules and regulations and securities laws in 2005.

11

54. There were numerous violations of Sprint's ethics code by Sprint executive officers, including Forsee, in 2004 and 2005 in connection with the violations Jordan reported. Inasmuch as none of those officers was not held accountable for his violations of Sprint's ethics code, each of them was implicitly granted waivers of Sprint's ethics code.

55. Each violation of SEC rules and regulations and securities laws described above constituted a violation of Sprint's ethics code.

56. In 2005, Jordan was responsible for preparing the disclosure for Sprint's proxy statement and annual report regarding Related Party Transactions, and Jordan was identified by name in Sprint's Disclosure Controls and Procedures as being a member of the Drafting Team for Sprint's 2005 joint proxy statement/prospectus.

57. In 2005 each failure by Forsee or any other Sprint employee to fully disclose information to Jordan or to respond fully, accurately, and in a timely manner to a request regarding the Relocation-Related Transactions constituted a violation of Sprint's Disclosure Controls and Procedures and Sprint's ethics code.

58. Each false certification as to the completeness and accuracy of Sprint's SEC filings was a violation of Sprint's ethics code.

59. In 2004 and 2005 Sprint officers implicitly granted themselves waivers of Sprint's ethics code with respect to the violations Jordan reported.

60. Sprint did not disclose that any waiver of its ethics code had been granted expressly or implicitly to any executive officer in 2004 or 2005.

61. The information that Sprint officers, including Forsee, caused Sprint to fail to disclose to shareholders about waivers of Sprint's ethics code caused other Sprint representations about the

standards to which Forsee would be held and the strength of Sprint's corporate governance and compliance to be materially false and misleading.

62. For example, in its 2003 and 2004 annual reports, which were filed in 2004 and 2005, respectively, Sprint assured shareholders and investors that (i) a notice of any waiver of the ethics code for any Sprint executive officer would be posted on Sprint's website, (ii) "only the board of directors or the Audit Committee may consider a waiver for an executive officer or director," and (iii) "Sprint does not expect to grant waivers" of its ethics code to any employee or director.

63. In Sprint's 2005 joint proxy statement/prospectus Sprint also represented that "the board of directors and Sprint's management firmly embrace good and accountable corporate governance and believe that it can be a tangible competitive advantage" and Sprint devoted virtually an entire page to proclaiming the strength of Sprint's corporate governance, including its ethics and compliance program. In Sprint's merger agreement, which Sprint attached to its 2005 joint proxy statement/prospectus, Sprint further included the following representation:

> No Sprint SEC Report, as of the date of such Sprint SEC Report, contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances in which they were made, not misleading ….

64. On March 1, 2005, the SEC issued a report of an enforcement action against a public company in which the SEC clarified that if representations in agreements attached to SEC filings were false or misleading, that would create potential liability, including for fraud. On May 13, 2005, the SEC informed Sprint that "Investors are entitled to rely upon disclosures in your publicly filed documents, including disclosures regarding representations and warranties and other terms contained in the merger agreement."

65. In preliminary and final versions of Sprint's 2005 joint proxy statement/prospectus Sprint represented to shareholders that, "[u]nder [his employment] agreement, Mr. Forsee has agreed

to certain covenants relating to [] confidentiality … and cooperation, his breach of which would result in forfeiture of his rights to his non-qualified pension benefit, any unpaid severance benefits and all of his unvested equity-based awards described above that are then outstanding." Upon information and belief, Forsee violated some of those covenants. However, he was not held accountable for his actions.

66. On about March 11 and April 29, 2005 in certifications that are required by federal securities laws and SEC rules and regulations, Forsee certified that (i) Sprint's 2004 annual report was prepared in full compliance with the SEC rules governing the preparation of annual reports and (ii) based on his knowledge, Sprint's 2004 annual report did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

67. Each such certification by Forsee in 2005 was false.

68. On April 7, 8 and 10, 19, and 28 and May 10, 2005 Jordan forwarded to Sprint officers or directors additional information and analysis regarding evidence of violations of SEC rules and regulations and federal securities laws, including the SOX 307 rules, and SOX Section 806, and fraudulent conduct by Sprint officers including Forsee.

69. On or about August 12, 2005, Sprint merged with Nextel to form Sprint Nextel Corporation.

70. In SEC filings in March through June 2005 Sprint repeatedly publicly declared that Sprint Nextel Corporation was a "new company" that was created in a "merger of equals" rather than merely an acquisition of Nextel. In connection with the merger between Sprint and Nextel, seven of the thirteen members of Sprint's Board of Directors, including the Chairman, were from Nextel, and all three Sprint attorneys who would have been in Jordan's management chain were from Nextel,

including the Corporate Secretary (Christie A. Hill), the Vice President of Regulatory Compliance (Gary D. Begeman), and the General Counsel (Leonard J. Kennedy).

71. Sprint officers including Forsee employed, and caused Sprint to employ, manipulative and deceptive devices in connection with purchases and sales of Sprint and Nextel securities.

72. At all relevant times, it was unlawful in connection with the purchase or sale of Sprint stock or Nextel stock for any person, directly or indirectly, to use the mail or any means of interstate commerce to use or employ any manipulative or deceptive device or contrivance in contravention of SEC rules and regulations. Manipulative and deceptive devices include the purchase or sale of Sprint stock by a Sprint officer or employee when that officer or employee is aware of material nonpublic information about Sprint.

73. Manipulative and deceptive devices include making an untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

74. Numerous transactions constituting purchases or sales of securities using means of interstate commerce occurred on the basis of the information contained in or omitted from Sprint's 2003 and 2004 annual reports and Sprint's 2004 and 2005 proxy statements, including the following. On about August 12, 2005, Nextel shareholders exchanged their Nextel securities for Sprint securities and Sprint issued Sprint securities to Nextel shareholders on the basis of the joint proxy statement/prospectus that Sprint filed in preliminary and final form in 2005.

75. Upon information and belief, Forsee, Kennedy and other Sprint officers sold Sprint securities to third parties between August 12, 2005 and March 6, 2006. For example, on August 17, 2005, Forsee sold 626,250 shares of Sprint stock for $16.6 million. In doing so, Forsee disposed of nearly half of all of the Sprint securities he owned. On August 17, 2005, Kennedy also sold 250,086

shares of Sprint stock for about $6.6 million, thereby disposing of about 91 percent of the Sprint securities he owned.

76. Sprint also sold securities to Sprint employees based on registration statements that incorporated by reference information from the annual reports and proxy statements that Sprint filed with the SEC in 2004 and 2005.

77. On about September 20 and December 23, 2005 Jordan provided or caused to be provided information to Sprint officers, including Forsee and Kennedy regarding violations of SEC rules and regulations, federal securities laws, and fraud by current or former Sprint officers.

78. On about December 18, 2007 Daniel R. Hesse became Sprint's CEO and on about October 13, 2008 Charles R. Wunsch became the General Counsel and Corporate Secretary of Sprint.

79. On November 24 and December 14, 2009, Jordan provided information to Sprint officers, including Hesse and Wunsch regarding violations of SEC rules and regulations, federal securities laws, and fraud by former Sprint officers.

## RETALIATION AGAINST JORDAN

80. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

81. On March 23, 2005, Sprint officers who knew of Jordan's protected activities and because of his protected activities caused another Sprint officer to suspend Jordan, instructing him to stay "out of the office … until April 1, 2005."

82. Those Sprint officers subsequently instructed Jordan to remain out of the office until April 12, 2005. Jordan again attempted to return to work on April 12, 2005; however, Sprint officers who knew of Jordan's protected activities on April 7, 8 and 10, 2005 caused another Sprint officer to suspend Jordan indefinitely, instructing him that he was relieved of all duties, that he must

16

immediately leave the Sprint campus, that he must refrain from returning to the Sprint campus, and that he must remain on administrative leave indefinitely for the convenience of Sprint. Jordan requested clarification of the reason he was being suspended and on whose authority, but he received no response to his requests.

83. Since at least February 9, 2005, because of Jordan's protected activities the defendants were actively preventing Jordan from performing his assigned work of preparing disclosures for inclusion in Sprint's 2005 joint proxy statement/prospectus.

84. On or about April 12, 2005, Sprint officers who knew of Jordan's protected activities, and because of Jordan's protected activities, caused Jordan's computer to be confiscated and his voicemail account at work to be discontinued so anyone calling Jordan's work number would have no indication that Jordan was employed at Sprint.

85. On or about April 13, 2005, Sprint closed Jordan's company credit card account. As a direct and proximate result of the retaliation by Jordan's entire management chain, Jordan believed that he had no choice but to resign from Sprint against his wishes.

86. On or about April 19, 2005, Jordan submitted notice to Gerke of his resignation, claiming constructive and retaliatory discharge. Sprint did not attempt to address or discuss Jordan's concerns. Instead, Sprint officers who knew of Jordan's protected activities, and because of Jordan's protected activities, caused another Sprint officer on April 20, 2005 to promptly accept Jordan's resignation.

87. Sprint officers who knew of Jordan's protected activities detailed above, and because of Jordan's protected activities, caused Sprint to refrain from reinstating Jordan at Sprint, both before and after the merger with Nextel, as well as after Hesse became Sprint's CEO in December 2007 and Wunsch became Sprint's General Counsel in October 2008.

88. Sprint officers who knew of Jordan's protected activities detailed above, and because of Jordan's protected activities, caused Sprint agents to submit statements to the SEC in 2008 about Sprint officers' conduct and about Jordan, including about Jordan's protected activities, so as to mark Jordan for special antagonism or enmity so that the SEC would refrain from taking action that would assist Jordan in pursuing his claims before the DOL.

89. The statements made to the SEC in 2008 were designed to prevent Jordan's reinstatement at Sprint and to dissuade the SEC from submitting an amicus brief in support of Jordan's position in the DOL proceedings. Many statements made in the submissions to the SEC were false or misleading.

90. Sprint officers who knew of Jordan's protected activities detailed above, and because of Jordan's protected activities, caused Sprint employees or representatives to prepare and submit statements to the SEC in December 2005 and January 2010 describing the actions of Sprint officers and Jordan's protected activities in false and misleading terms and in a manner designed to mark Jordan for special avoidance, antagonism or enmity by the SEC and by Jordan's future potential employers.

91. Sprint officers who knew of Jordan's protected activities detailed above, and because of Jordan's protected activities, caused Sprint employees or representatives to make those statements to the SEC in a manner that compelled the SEC to publish them on-line permanently in a forum that is routinely and regularly accessed by securities lawyers and companies who employ them.

92. Crucial statements made in those submissions to the SEC were false or misleading. Those statements created a significant risk that they would affect Jordan's ability to obtain or maintain employment for the remainder of his professional life. The submissions to the SEC in 2005 also caused to be publicly disclosed for the first time purported details of Jordan's protected activities.

93. The defendants' actions have permanently damaged Jordan's reputation.

94. Jordan has suffered general and special damages consisting of lost income and benefits incident to employment, emotional distress and the costs of pursuing his claims in DOL proceedings and the instant litigation.

**WHEREFORE, Jordan demands judgment as follows:**

**PRAYER FOR RELIEF**

Jordan is seeking all relief necessary to make him whole, including:

A. As against defendant Sprint, reinstatement at Sprint or front pay (to the extent that it is determined that reinstatement is effectively precluded). Front pay should include the cost of benefits comparable to those Jordan would receive as an employee of Sprint.

B. As against all defendants, jointly and severally, compensatory damages to include back pay, raises, bonuses, benefits, with interest thereon, and other items necessary to make Jordan whole, including damages sufficient to compensate Jordan for his emotional distress and loss of reputation.

D. As against all defendants, jointly and severally, reasonable attorney fees for attorneys who have assisted Jordan in the pursuit of his claims in federal district court or before the DOL and costs associated with those proceedings, including reimbursement for deposition fees, expert witness fees, travel expenses, and other expenses to collect and produce evidence in those matters.

F. Such equitable, injunctive or other relief as the Court may deem to be just and proper.

DATED: August 30, 2012                    Respectfully submitted,

*/s/ Jack R. Jordan*

Jack R. Jordan
Parkville, MO 64152
Telephone: 816-746-1955
Email: Substantive2@yahoo.com

## DEMAND FOR TRIAL BY JURY

Plaintiff Jordan demands trial by jury.

DATED:  August 30, 2012  Respectfully submitted,

Jack R. Jordan
Parkville, MO 64152
Telephone:  816-746-1955
Email:  Substantive2@yahoo.com